GAUDIN, Judge.
This is an appeal by Ronnie W. and Roger D. Flint, brothers, from a judgment of the 29th Judicial District Court which awarded $12,500.00 to plaintiffs Mr. and Mrs. Morris Harris as a reduction in the purchase price of a residence previously owned by the Flints, who were named defendants along with Clyde Casey Real Estate, Inc. The judgment was rendered against all defendants jointly, severally and solidarily.
The judgment also awarded $3,570.00 to the Flints as third party plaintiffs, with third party defendant, Casey, cast in judgment.
On appeal, the Flints argue that the real estate agent represented both the buyers and sellers and is liable to each for culpable misrepresentation, that the award of attorney fees was generated only through agent fault and that the amount awarded was excessive. We find, however, that the record and law support the judgment and we affirm it.
Casey filed an answer to the Harrises’ appeal, contending that the defects were obvious, that the failure to furnish a structural report to the buyers did not cause any damage and that, consequently, Casey should not have been required to pay attorney fees.
No doubt there was agent deceit. The agreement to purchase 202 Fifth Street in Luling, Louisiana was predicated on a favorable structural report by engineers. The real estate agent reviewed the report and advised that it was favorable when in fact it was not. Mr. and Mrs. Harris accepted the agent’s assurance without seeing the engineers’ report and went ahead with the act of sale.
The Harrises were eventually provided with the structural report in March of 1985 and this action in redhibition followed. Under LSA-C.C. art. 2543, the purchase price can be lowered. The article states in pertinent part that “... in a redhibitory suit, the judge may decree merely a reduction of the price.” (Underlining provided.)
Here, the trial judge made several significant findings. She personally inspected the residence on January 25, 1988 and she stated this in her assigned “Reasons for Judgment”:
“The defects complained of by the plaintiffs are readily observable. The closet floor in the master bedroom is damp. Black sealant is visible along the exterior of the master bedroom wall adjacent to the closet, indicating a previous attempt to keep water out. The master bedroom window is plainly out of line, although drapes cover that problem, as well as the cracking below the window. The room is lopsided. The leak in the den ceiling is accompanied by obvious signs of rotting. Numerous cracks align the windows and doors in every room. The framing of the garage door has separated from the bricks.”
In addition, the trial judge accepted Mrs. Harris’ testimony that the defects were neither apparent nor could they have been *50 discovered by simple inspection. Only when the defects are pointed out are they, as the trial judge noted, “readily observable.”
. The structural report that the agent obtained but refused to show Mrs. and Mrs. Harris stated:
“An inspection was made on September 22, 1984 on the above referenced residence to evaluate the structural stability of the concrete slab.
“Our inspection revealed differential settlement at the left, rear of this residence and also slight differential settlement at the right and left hand front side of the garage.
“It is our opinion that this differential settlement has occurred over the years and possibly this concrete slab is now in a static state. Whether there will be further settlement in both areas over the coming months, we cannot state emphatically; however, we feel that there is the possibility that the residence has now reached the ultimate settlement.
“In regards to the structural stability of the concrete slab, we feel that this concrete slab was constructed properly and the design of same is functioning as anticipated.
“In regards to the leveling of the room at the rear, we feel that this could be accomplished by simply “topping” the concrete slab with a mixture of cement, sand and an epoxy binder. Of course, you must realize this will mean that the door, frame and baseboards would have to first be removed and then replaced after the topping is in place.
“In regards to the window in this room, it is our opinion that this window was installed out-of-level which further accentuates the uneveness of the slab in this room. Here again, it is a very simple procedure to re-install this window.
“As you know, this is a cursory inspection and is not intended as an inspection in depth. We were not authorized to conduct extensive testing for the load capacity of this concrete slab nor were we authorized to take on-site elevations of same. We are, therefore, not responsible for any deficiencies that may be found at a later date. We make no guarantee or warranty regarding areas not seen or accessible nor is the report and our opinion to be considered a guarantee or warranty of the above mentioned residence.”
Mrs. Harris testified that she inspected the house three times before the act of sale was passed on November 16, 1984. On the first inspection, about September 1, 1984, Mrs. Harris said that she noticed “... a spot on the ceiling where the paper had torn ...” but no other defects.
The second inspection was a week after the initial visit. At that time, Mrs. Harris said she was advised of the structural report and she requested a copy. The purchase agreement was “... predicated upon accepting structural report from engineers.”
Mrs. Harris said that draperies in all rooms except the den prevented the windows from being seen.
A final inspection was made by Mr. and Mrs. Harris. It was uneventful, and the sale was passed. Mr. and Mrs. Harris received the structural report four months after the act, and both testified emphatically that they would not have purchased the home had they been aware of the report’s contents.
The real estate agent was asked why the report hadn’t been given to Mr. and Mrs. Harris before the sale.
She said:
“No. I wish I had.
“I had it in my box for awhile. It’s in the folder. And, frankly, after a while, it was really of no concern. I mean, I really felt it was a good house and everything else. I really didn’t think there was anything wrong.”
While the agent’s intentions were arguably good, her decision to withhold the structural report from the purchasers— particularly in view of the specific clause in the agreement to purchase requiring the report to be provided — was unsound.
*51 Casey argues that the failure to furnish the report caused no harm but the record strongly indicates otherwise. We affirm the district court judgment, with the Flints and Casey to equally share costs of this appeal.
AFFIRMED.